KERRY E. COCHENOUR,                )
                                   )
                Plaintiff,         )
                                   )
        v.                         )        No. 2:10 CV 25 DDN
                                   )
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

## MEMORANDUM

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Kerry E. Cochenour for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the ALJ's decision is affirmed.

## I.  BACKGROUND

Plaintiff Kerry E. Cochenour was born on November 1, 1959. (Tr. 25.) He is 6' tall and weighs 152 pounds. (Tr. 119.) He lives alone. (Tr. 25.) He finished the twelfth grade, but did not pursue college or a vocational, technical, or trade school. (Tr. 25.) He last worked as a plant technician at Pioneer Hi-Bred on January 24, 2005. (Tr. 25, 27.)

On November 6, 2006, Cochenour applied for disability insurance benefits, alleging that he became disabled on September 1, 2005 on account of protruded discs in his neck and lower back. (Tr. 120.) He received a notice of disapproved claims on December 20, 2006. (Tr. 61-

66.)  He filed a written request for a hearing on January 9, 2007.[1] (Tr. 69.)  At the hearing, he amended his alleged onset date to January 24, 2005.  (Tr. 23.)  After a hearing on March 26, 2008, the ALJ denied benefits on May 13, 2008.  (Tr. 5-16, 20-59.)  On January 29, 2010, the Appeals Council denied his request for review.  (Tr. 1-5.)  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On January 24, 2005, Cochenour was admitted at Scotland County Memorial Hospital sharp, burning, severe pain in his back, radiating to his leg.  (Tr. 259.)  Cochenour rated his pain a 10/10, and noted tingling and numbness in his right leg.  (Tr. 260.)  Cochenour reported no known recent injury.  (Id.)  On January 25, 2005, Jerome J. Gleich, M.D., reviewed a lumber MRI, and opined that Cochenour's L1-L3 and L5-S1 appeared normal, but that a central and right para-central focal disc protrusion indented the thecal sac and deviated the nerve root at L4-5. (Tr. 179, 264.)  Dr. Gleich's impression was focal central disc protrusion at L4-5.  (Id.)  Cochenour was discharged that day.  (Id.)

On February 2, 2005, Cochenour was seen by Dr. Gleich for increased back and neck pain.  (Tr. 177.)  Dr. Gleich opined that a cervical MRI revealed a moderate sized disc protrusion at the C5-6 level which was relatively right sided with some effacement of the exiting nerve root. (Id.)  Cochenour's other disc levels appeared relatively normal.  (Id.) Dr. Gleich also evaluated a lumbar MRI, and found marked straightening of the normal lumbar lordotic curvature.  (Tr. 178.)  Dr. Gleich opined that Cochenour's bone signal, cord, clonus, dorsal lumbar junction, and L1-L4 appeared normal, but that there was a moderately sized central and right para-central disc protrusion at L4-5 which indented the thecal sac and deviated the existing nerve root.  (Id.)

---

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case.  20 C.F.R. §§ 404.906, 404.966 (2007).  These modifications include, among other things, the elimination of the reconsideration step.  See id.

On February 10, 2005, Wayne E. Janda, M.D., wrote to John Beckert, M.D., regarding an examination of Cochenour that Dr. Janda had performed that day. (Tr. 171-73.) Dr. Janda diagnosed Cochenour with neurogenic claudication, work aggravated by patient history; focal disc protrusion at L4-5; and cervical radicular symptoms of neurogenic claudication and give-way weakness in the shoulder girdle. (Tr. 171.) Cochenour complained of shooting upper and lower back pain and neck pain, and rated his pain at an 8/10. (Tr. 171-72.) He had been suffering from back pain for 16 years, but was able to get relief until six months earlier, when he bent over and fell to his knees while at work. (Tr. 171.) After falling at work, he had progressively more difficulty treating his pain, and was forced to visit the emergency room. (<u>Id.</u>) He was taking Roxicet to treat his pain.[2] (<u>Id.</u>)

Cochenour also reported numbness and tingling in his right arm, hand, and fingers, and weakness in his shoulder, arm, and grip. (Tr. 172.) He reported having difficulty looking up and down, turning his head, driving, lifting, bending, couching, standing, and sleeping. (<u>Id.</u>) He had acute symptoms for 4-5 days. (<u>Id.</u>) Dr. Janda's examination revealed markedly restricted neck motions, muscle tightness, and guarding, although Cochenour's shoulder motions were functionally adequate with only some upper back and neck pain. (<u>Id.</u>) Dr. Janda's examination also revealed marked restrictions in Cochenor's back motions, muscle tightness, and guarding. (<u>Id.</u>) Dr. Janda opined that the tenderness was in the iliolumbar region at the lumbosacral junction at L4-5 on the left. (<u>Id.</u>) Cochenour's knee reflexes were physiological and equal; ankle reflexes were diminished but symmetrical; and transfers and gait were painful and guarded. (Tr. 172.) X-rays revealed intervertebral disc space narrowing at C4-5, C5-6, and C6-7, with some neuroforaminal crowding at C5-6 bilaterally. (<u>Id.</u>) There was no evidence of a fracture or bone or joint abnormality. (<u>Id.</u>) Dr. Janda recommended a cervical MRI of Cochenour's neck, conservative management, and that Cochenour may need epidural steroid injections in the future. (Tr. 173.) Dr. Janda also recommended a neurology

---

[2]Roxicet is used to relieve moderate to severe pain. http://www.webmd.com/drugs (last visited May 5, 2011).

consultation because of the possibility of a serious underlying neurologic dysfunction. (Id.)


On February 22, 2005, Cochenour went to Scotland County Memorial Hospital in connection with his workers' compensation claim and increased back and neck pain. (Tr. 264-65.) Dr. Gleich reviewed a cervical MRI and found a moderate sized disc protrusion at the C5-6 level that was relatively right sided with some effacement of the exiting nerve root. (Tr. 265.) Cochenour's other disc levels appeared relatively normal. (Id.) After reviewing a lumbar MRI, Dr. Gleich noted marked straightening of the lumbar lordotic curvature. (Tr. 266.) Dr. Gleich also noted a moderately sized central and right para-central disc protrusion at L4-5 that was indenting the thecal sac and deviating the existing nerve root. (Id.)

On March 21, 2005, Cochenor was seen by Patrick Hitchon, M.D., for complaints of neck, back, leg, ankle, and hip pain. (Tr. 236-37.) Dr. Hitchon noted no evidence of radiculopathy, myelopathy, or weakness. Although MRIs revealed herniated discs at C5-6 and L4-5, these abnormalities were non-surgical and did not explain Cochenour's symptoms. (Tr. 236.) Dr. Hitchon directed Cochenour to normalize his lifestyle, and opined that Cochenour would be able to return to work soon. (Id.)

On May 25, 2005, Cochenour attended an Occupational Health Program. (Tr. 190-93.) Cochenour reported lower back and neck injuries beginning on January 24, 2005, caused by repetitive pushing, pulling, and lifting. (Tr. 190.) As a result of his injuries, he reported pain and tingling, which was worsened by lifting and bending and which could not be relieved. (Tr. 191.) He was taking Roxicet and attending physical therapy. (Tr. 192.)

That day, Cochenour also saw Dr. Johns for care and to undergo a work-related disability evaluation. (Tr. 206-08.) Cochenour reported his symptoms increased a year and a half earlier, but sharply increased around January 24, 2005, when he returned home from work and bent over to put on a sock, which caused excruciating pain in his back. (Tr.

206.) Cochenour reported not sleeping well, and was having occasional pain in his left leg and left arm. (Id.) He rated his pain at a 5/10. (Tr. 207.) Dr. Johns diagnosed Cochenour with degenerative disc disease with herniated nucleus pulposus at C5-6; neck pain, decreased from previous visit; chronic low back pain, slightly worse than the previous visit, and gastroesophageal reflux disease (GERD), well controlled on Prilosec.[3] (Id.) Dr. Johns successfully gave Cochenour an epidural steroid injection and discharged him in stable condition. (Id.)

Follow-Up Progress Notes from Mercy Occupational Health Program from May 25, 2005 through December 7, 2005 show Cochenour continuing to suffer from neck and back pain. (Tr. 180-82.) He also reported pain shooting down his legs and numbness in his fingers. (Tr. 180.) He was given epidural steroid injections and prescribed Amitriptyline, Vicodin, Flexeril, and Lyrica.[4] (Tr. 181-89.)

On June 20, 2005, Cochenour was seen by Brian Johns, M.D., for complaints of lower back and neck pain. (Tr. 204.) Cochenour's lower back pain was intermittent and could be relieved if he pushed himself up with his hands briefly, but his neck pain was his main problem because it kept him from sleeping. (Id.) Amitriptyline did not help his pain, and made him groggy during the day. (Id.) At the time, he was working in maintenance, and there was nothing at work that bothered him. (Id.) His range of motion was good, a straight leg raise test was negative, and he had no spasms. (Id.) Dr. Johns diagnosed neck pain and low back pain, and directed Cochenour to discontinue his Amitriptyline, begin Flexeril and Vicodin, attend therapy three times each week, and continue home exercises. (Id.) Dr. Johns opined that Cochenour could return to work without restrictions. (Tr. 205.)

---

[3]Prilosec is used to treat certain stomach and esophagus problems, such as acid reflex and ulcers. http://www.webmd.com/drugs (last visited May 5, 2011).

[4]Amitriptyline is used to treat mental/mood problems such as depression. Vicodin is used to relieve moderate to severe pain. Flexeril is used to relax muscles, thereby decreasing muscle pain and spasms associated with strains, sprains, and other muscle injuries. Lyrica is used to treat pain caused by nerve damage. http://www.webmd.com/drugs (last visited May 5, 2011).

From June to July 2005, Cochenour attended Outpatient Physical Therapy Recertification at HCHC Rehabilitation Services for therapy so that he could sleep better at night. (Tr. 199-203.) He rated his pain as a 7/10. (Tr. 201.)

On July 26, 2005, Cochenour was seen by William Hammonds, M.D., at the Center for Pain Medicine and Regional Anesthesia, for complaints of neck pain. (Tr. 195-98.) Cochenour reported pain beginning years prior, but getting significantly worse on January 24, 2005. (Tr. 196.) Dr. Hammonds noted that MRIs demonstrated disc pathology, but that Cochenour's lower back had responded well to physical therapy, exercises, and working regular duty. (Id.) Cochenour said that he could "live with" the low back pain, but that the neck pain was "an all day, every day deal." (Id.) He rated his neck pain as a 5-6/10, and said his pain kept him awake at night. (Id.) Physical therapy treated the discomfort in his posterior neck musculature, and his arm symptoms had mostly resolved, although his residual pain was in his midline. (Id.) He was taking Celecoxib and Omeprazole.[5] (Tr. 197.) He did not appear to be in distress, and was well-nourished, well-groomed, calm, cooperative, alert, and thin. (Id.) He had a normal range of motion, a 5/5 motor strength, and normal muscle tone. (Id.) Dr. Hammonds diagnosed Cochenour with degenerative disc disease with herniated nucleus pulposis at C5-6 with severe neck pain secondary, chronic low back pain which had responded well to conservative treatment, and GERD which was well-controlled by Priolsec. (Id.) Dr. Hammonds recommended a cervical epidural steroid injection, which was performed that day, and that Cochenour begin taking Celebrex, stop taking Cyclobenzaprine, and follow-up in 3 weeks.[6] (Tr. 197-98.)

---

[5]Celecoxib is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling. Omeprazole is used to treat stomach and esophagus problems, such as acid reflux and ulcers. http://www.webmd.com/drugs (last visited May 5, 2011)

[6]Celebrex is a nonsteroidal anti-inflammatory drug used to relieve pain and swelling associated with arthritis. Cyclobenzaprine is used to relax muscles. http://www.webmd.com/drugs (last visited May 5, 2011).

On August 22, 2005, Cochenour was seen by Dr. Johns for neck and lower back pain. (Tr. 194, 217.) Cochenour reported being pain-free after an epidural steroid injection, but that his pain returned when he began more physically demanding tasks at work. (Tr. 217.) Dr. Johns diagnosed low back pain with no significant change, and neck pain requiring temporary restrictions, which could become permanent. (Id.) Dr. Johns recommended treatment with home exercises and medication. (Tr. 194, 217.) Dr. Johns imposed work restrictions on Cochenour's ability to lift, push, pull, bend/twist his back, bend/twist his neck, and to reach above his shoulders. (Tr. 194.)

Also on August 22, 2005, Cochenour was seen by Dr. Hammonds for neck and low back pain. (Tr. 211-14.) Cochenour reported suffering from the pain for years, but that the pain increased on January 24, 2005 while at work, and increased even more two days later. (Tr. 212.) Dr. Hammonds noted that MRIs revealed disc pathology, but also that Cochenour's low back has responded well to physical therapy, exercises, and working regular duty at work. (Id.) An epidural steroid injection administered on July 26, 2005 reduced Cochenour's pain by 50 percent for almost 4 weeks, until he returned to heavy lifting at work. (Id.) His neck pain increased, causing numbness in his fingers and making him unable to sleep. (Id.) Cochenour was taking Celecoxib and Omeprazole. (Id.) A physical exam revealed normal flexion, extension, lateral rotation, and lateral bending in his neck, and normal thoracic kyphosis and normal lumbar lordosis in his back. (Tr. 213.) He had normal range of motion, and his seated straight leg testing was normal bilaterally. (Id.) Dr. Hammonds diagnosed Cochenour with degenerative disc disease with herniated nucleus pulposus at C5-6; severe, mechanical neck pain secondary to his degenerative disc disease; chronic low back pain, slightly worse than his previous visit, and GERD, well controlled on Prilosec. (Id.) Dr. Hammonds administered an epidural steroid injection, and directed Cochenour to continue taking Celebrex and to follow-up in 2 months. (Id.)

On September 19, 2005, Dr. Johns saw Cochenour for his back and neck pain. (Tr. 215.) Cochenour reported minor improvement in his neck pain, that he was sleeping better, and improvement with his shoulder and

left hand. (Id.) His low back did not change much, and he still had shooting pain in his knees when he bent over. (Id.) He also suffered pain when he twisted wrong, moved his foot or crossed his legs. (Id.) Straight leg raise testing was negative. (Id.) Dr. Johns diagnosed Cochenour with chronic neck and back pain, opined that another epidural steroid injection might be helpful, and directed Cochenour to begin taking Lyrica. (Id.) Dr. Johns noted that he did not have an anatomic explanation for Cochenour's precise symptoms based on his imaging, but that his complaints had a seeming radicular component. (Tr. 215.) Dr. Johns maintained Cochenour's work restrictions, and scheduled a follow-up appointment in a month. (Id.)

On October 17, 2005, Cochenour followed-up with Dr. Johns. (Tr. 209.) After increasing his dosage of Lyrica, Cochenour reported a sharp increase in pain, but that the pain began to significantly improve. (Id.) He was sleeping better and his neck pain had improved to only 4-5/10. (Id.) He had a cervical epidural steroid prior to his visit with Dr. Johns. (Id.) Cochenour's straight leg raise was negative, and he had normal lumbar spine range of motion in the sitting position. (Id.) Dr. Johns directed him to continue taking his medication and to obtain a functional capacity evaluation in a month. (Id.) Dr. Johns released Cochenour to return to work, but restricted his lifting, pushing, pulling, bending and twisting his back and neck, and reaching above his shoulders. (Tr. 210.)

Also on October 17, 2005, Cochenour was seen by Dr. Hammonds for complaints of neck and low back pain. (Tr. 244-46.) Cochenour rated his low back pain at 5/10, but that it increased to 8/10 if he irritates it. (Tr. 244.) Cochenour was taking Celecoxib, Omeprazole, and Pregabalin. (Id.) Dr. Hammonds administered an epidural steroid injection. (Tr. 245.)

On December 2, 2005, Mark Blankespoor, P.T., tested Cochenour's physical abilities. (Tr. 175.) Cochenour demonstrated safe performance throughout the testing, and required no verbal cues to maintain proper mechanics. (Id.) He performed the tasks at a normal pace with smooth and coordinated movements, and his mechanics were consistent with his symptoms and physical limitations. (Id.) Mr. Blankespoor listed

Cochenour's significant abilities as sitting/standing tolerance; walking tolerance; bilateral upper extremity grip strength; and bilateral upper extremity coordination. He listed Cochenour's significant deficits as lifting/carrying; pushing/pulling; positional tasks; and step ladder climbing. (Id.) Mr. Blankespoor opined that Cochenour's current capabilities were within the medium category (lifting up to 30 pounds occasionally), and that Cochenour did not meet the physical requirements of his previous job as a production technician. (Id.)

On December 7, 2005, Cochenour was seen by Dr. Johns for neck and back pain. (Tr. 176, 221-23.) Cochenour reported daily pain, which he rated a 5-6/10, in the center of his neck, fingers of his left hand, lower back, and legs. (Tr. 221.) The range of motion is his neck was slightly limited and tender, but the range of motion of his spine was within normal limits. (Id.) Straight leg raise testing was negative. (Id.) Dr. Johns noted Cochenour's "long history of back and neck pain," including MRIs that revealed disc protrusions at C5-C6 and L4-L5, but also that the abnormalities in the MRIs did not require surgery and did not explain Cochenour's symptoms. (Id.) Dr. Johns opined that Cochenour had reached maximum medical improvement, and that he would need continuing medical care, which at a minimum would be to continue taking Lyrica twice daily. (Tr. 222.) Dr. Johns opined that Cochenour's pain affected his daily activities; that he had loss of range of motion; and that his impairments totaled a 12 percent impairment. (Id.) Dr. Johns also opined that Cochenour could return to work with permanent restrictions on his abilities to lift, push, pull, bend/twist his back, bend/twist his neck, squat, kneel, climb, and perform overhead work. (Tr. 176, 223.)

On January 12, 2006, Cochenour was seen by Dr. Johns for neck and low back pain. (Tr. 219-20.) Dr. Johns directed Cochenour to continue taking Lyrica and do home exercises. (Id.) Dr. Johns limited Cochenour to lifting 30 pounds at any one time; 10-20 pounds occasionally; occasionally bending and twisting his back and neck; occasionally squatting, kneeling, and climbing; and rarely performing overhead work. (Tr. 220.) Dr. Johns believed Cochenour's symptoms would not change significantly in the future. (Id.)

On February 22, 2006, Cochenour was seen by J. Beckert, D.O., to discuss Cochenour's medical situation and his worker's compensation claim. (Tr. 254.) Dr. Beckert opined that Cochenour was probably not going to be able to return to work with the restrictions imposed by Dr. Johns. (Id.) Dr. Beckert told Cochenour of the possibility of total disability, and the possibility of a re-training program, but that he would not overrule Dr. Johns's opinion regarding total disability. (Id.) Dr. Beckert also told Cochenour that if he went back to work for a short period of time, that his prognosis would be extremely guarded, and that his employer would likely not allow him to work at his previous place of employment. (Id.)

On April 19, 2006, Cochenour was seen by Dr. Hammonds for neck and low back pain. (Tr. 247-48.) Dr. Hammonds noted that Cochenour's epidural steroid injection helped noticeably, and that his improved range of motion in his neck allowed him to drive. (Tr. 247.) Cochenour reported his pain decreasing from 7/10 to 4/10, which he said was tolerable, and that he was sleeping much better, although he was stressed because he lost his job and his wife was divorcing him. (Id.) He was taking Celecoxib, Omeprazole, and Pregablin, and rated his pain that day as a 4-5/10. (Id.) He had no tenderness in his neck or back, and his neck range of motion was normal. (Tr. 248.) Dr. Hammonds prescribed Celebrex, deferred an epidural steroid injection until later if the pain worsened, and scheduled a follow-up appointment in 6 months. (Id.)

On October 2, 2006, Cochenour was seen by Dr. Hammonds for severe low back pain, which Cochenour rated an 8/10 and described as deep and burning. (Tr. 249.) Dr. Hammonds opined that the dermatomal pattern was highly suggestive of S1 dermatomal symmetry. (Id.) Cochenour also felt that he had developed a slight motor weakness. (Id.) Cochenour's range of motion in his neck was limited due to pain, he had tenderness in his neck and lower back, and his left extremities were weak at L5 and S1. (Tr. 250.) Straight leg raises to 60 degrees were bilaterally positive for pain radiating past the knee, and Cochenour had persistent numbness in his left leg after the test. (Id.) A Patrick test bilaterally was negative. (Id.) Dr. Hammonds diagnosed Cochenour with

degenerative disc disease with new motor symptoms; neck pain, decreased from the previous visit; chronic low back pain; and GERD, well controlled on Prilosec. (Id.) Dr. Hammonds ordered MRIs of Cochenour's cervical and lumbar spine, adjusted Cochenour's medicine to Omeprazole, Celecoxib, and Pregabalin, and directed Cochenour to return in one month. (Tr. 249-50.)

On November 22, 2006, Cochenour completed a Functional Report – Adult form provided by the Social Security Administration. (Tr. 134-41.) He listed his daily activities as walking 3 blocks to the Post Office and laying down and watching television for short periods of time, but that he could not do much because of pain, and could not sit or stand long. (Tr. 134.) He reported pain waking him at night, and pain causing him difficulties dressing, bathing, caring for his hair, and shaving. (Tr. 135.) He reported preparing his own sandwiches and soup daily, and doing some cleaning, laundry, and mowing for 20 minutes at a time. (Tr. 136.) He said that he goes outside daily, walks and drives alone, and goes grocery shopping weekly for 30 minutes to an hour. (Tr. 137.) He listed his hobbies as fishing, hunting, and watching television, although his injury restricts the amount of time he can spend enjoying his hobbies. (Tr. 138.) He reported having no social difficulties. (Tr. 138-39.) He said he could lift only 10 pounds; seldom squat, bend, or reach; stand for 5-10 minutes; walk 3-6 blocks; and sit for 20-30 minutes. (Tr. 139.) He also said that he does not follow written instructions well, but follows oral instructions very well. (Id.)

On December 20, 2006, T. J. Hasenbeck, a medical consultant, completed a Physical Residual Functional Capacity Assessment form. (Tr. 269-74.) Mr. Hasenbeck noted the primary diagnoses as herniated disc at C5-6 and L4-5 on the right. (Tr. 269.) Mr. Hasenbeck opined Cochenour could (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand and/or walk about 6 hours in an 8-hour day; (3) sit with normal breaks for a total of about 6 hours in an 8-hour day; (4) push and/or pull for an unlimited amount of time; (5) frequently stoop; (6) occasionally climb, kneel, crouch, or crawl, and (7) never balance. (Tr. 270, 72.) Mr. Hasenbeck further found that

Cochenour had to avoid repetitive overhead reaching, but otherwise had no manipulative, visual, or communicative limitations. (Tr. 272-73.) Regarding environmental limitations, Mr. Hasenbeck found that Cochenour had to avoid concentrated exposure to extreme cold, vibrations, and hazards, but had no limitations regarding extreme heat, wetness, humidity, noise, and fumes. (Tr. 273.) Mr. Hasenbeck had some question as to whether Cochenour's complaints were consistent with the MRI findings, but otherwise found his allegations credible. (Tr. 274.)

On May 4, 2007, Cochenour was seen by Richard Rosenquist, M.D., who ordered MRIs of his cervical and lumbar spine. (Tr. 286-87.) Dr. Rosenquist also changed his Celebrex prescription to Relafen; discontinued his Lyrica; and directed him to return in 6 months or sooner if he completed the MRI examinations. (Tr. 288.)

On August 21, 2007, Cochenour was seen by Dr. Rosenquist. (Tr. 289-91.) Cochenour reported that his low back pain was minimal and that his motor weakness had improved. (Tr. 289.) His range of motion in his neck was limited due to pain, but he had no tenderness in his neck or back. (Tr. 290.) Dr. Rosenquist directed him to continue exercising and stretching; continue taking Relafin; begin taking Effexor to combat depression; and consult with Dr. Stockman if permitted by insurance for further psychological help. (Id.)

On November 11, 2007, Dr. Beckert opined that Cochenour had a herniated nucleus pulposus at C5-6 and significant neck pain. (Tr. 297.) Dr. Beckert noted that Cochenour wanted to work but was unable due to pain limitations. (Id.) Dr. Beckert opined that Cochenour's pain, even when treated with medication, was incapacitating, and as a result, he was permanently and totally disabled regarding his prior employment. (Id.) Dr. Beckert noted the possibility of further evaluation at another center to assess his neurological impairment. (Id.) Dr. Beckert also noted that his prognosis was extremely guarded, and that he did not anticipate further improvement within a specified time frame. (Id.) On January 2, 2008, Cochenour was seen by Dr. Rosenquist for chronic cervical and lumbar back pain. (Tr. 305-06.) His mood was much improved, his appetite was good, and he was

sleeping better. (Tr. 305.) He had motor weakness and numbness in his left fingers, and rated his pain at 4-5/10, which he said was normal. (Id.) He was able to turn his head 90 degrees to the right and 30-40 degrees to the left. (Id.) He described muscular deconditioning during long periods of time such as during deer hunting. (Id.) Dr. Rosenquist found his lumbar spine alignment normal, but noted diffuse disc bulge at L3-L4, L4-L5, and L5-S1. (Tr. 306.) Dr. Rosenquist found no spinal canal or neural foraminal stenosis, but noted an annular tear at L4-L5. (Id.) Dr. Rosenquist's diagnosis was chronic cervical, left shoulder pain with radicular symptoms produced with left lateral flexion; depression - improved; questionable left shoulder rotator cuff tear; and chronic low back pain. (Id.) Dr. Rosenquist refilled his Effexor and Relafen prescriptions, and consulted with Dr. Brian Wolff for an orthopedic consultation regarding the possible left shoulder rotator cuff tear. (Id.)

Also on January 2, 2008, MRI results of Cochenour's lumbar spine revealed a normal lumbar spine alignment, but diffuse disc bulge at L3-L4, L4-L5, and L5-S1. (Tr. 293.) There was no spinal canal or neural foraminal stenosis at any level, but there was an annular tear at L4-L5. (Id.) An MRI of the cervical spine revealed normal alignment, but also a disc bulge at C5-C6 with effacement of the anterior thecal sac, with mild spinal canal stenosis and moderate bilateral neural foraminal stenosis. (Tr. 294.)

On January 11, 2008, Cochenour saw Dr. Beckert for his neck and back pain. (Tr. 296.) Dr. Beckert noted that Cochenour wanted to discuss options for pain management, and was taking pain medications. (Id.)

On January 12, 2008, Dr. Beckert completed a pre-printed Medical Source Statement questionnaire. (Tr. 276-79.) Dr. Beckert checked boxes indicating that Cochenour could (1) lift and/or carry less than 10 pounds occasionally and less than 10 pounds frequently; (2) stand and/or walk for less than 2 hours in an 8-hour workday; and (3) sit for less than 6 hours in an 8-hour workday. (Tr. 276-77.) Dr. Beckert also checked boxes indicating that Cochenour was limited in his ability to push and/or pull in his upper and lower extremities; that he could

never climb, balance, kneel, crouch, crawl, or stoop; that he was limited to occasionally reaching and in his gross and fine manipulation abilities, but had no limitations regarding his skin receptors, or his ability to see, hear, or speak; and that he was limited in his ability to withstand temperature extremes, vibrations, hazards, and fumes, but unlimited in his ability to withstand noise, dust, and humidity/wetness. (Tr. 277-79.)  Dr. Beckert supplied no medical or clinical findings supporting his conclusions.  (Tr. 276-79.)

On January 13, 2008, Cochenour's friend, Tyler Thomson, completed a form provided by the Social Security Administration's Office of Hearings and Appeals.  (Tr. 160-62.)  Mr. Thomson did not believe Cochenour could work because he could not lift objects and was depressed.  (Tr. 160.)  Mr. Thomson observed Cochenour having pain in his back, arm, shoulder, and neck, noticed he stopped to catch his balance, and believed he did not use a cane because he was embarrassed. (Tr. 161.)  Mr. Thomson opined that Cochenour could walk for 8 blocks or stand for 30-45 minutes before having to sit or lay down, and could sit for about 20 minutes before having to sand-up or lay down.  (Id.) Mr. Thomson also opined that Cochenour could lift 5 pounds with one hand, or 15 pounds with both hands.  (Id.)  Mr. Thomson noted that Cochenour had no personal hygiene problems, but had others perform his household chores.  (Id.)  Mr. Thomson also noted observing Cochenour appearing stressed on a regular basis.  (Tr. 162.)

On January 14, 2008, Cochenour's friend, Terri Jones, completed a form provided by the Social Security Administration's Office of Hearings and Appeals.  (Tr. 156-58.)  Ms. Jones did not believe Cochenour could work because of pain in his lower back, neck, shoulder, and hands.  (Tr. 156.)  Ms. Jones noticed that Cochenour could not sit or stand very long, had difficulties bending, had to use objects near him for balance, and always looked stressed.  (Tr. 156-58.)  Ms. Jones opined that Cochenour could walk for 8-10 blocks or stand for 30-45 minutes before having to sit or lay down, and could sit for 20-30 minutes before having to stand-up or lay down.  (Tr. 157.)  Ms. Jones also opined that Cochenour could lift 5 pounds with one hand and 10 pounds with both

hands.  (<u>Id.</u>)  Ms. Jones noted that Cochenour had difficulties holding a shaver, and that she had to help him with household chores.  (<u>Id.</u>)

On April 2, 2008, Cochenour was seen by Dr. Beckert for fatigue, depression, and pain in his upper gastric area. (Tr. 301.)  Dr. Beckert noted GERD-like symptoms and drew blood.  (<u>Id.</u>)  On April 7, 2008, Cochenour followed-up with Dr. Beckert.  (<u>Id.</u>)  Dr. Beckert prescribed Zocor[7] and a low-fat, low-cholesterol diet.  (<u>Id.</u>)


**Testimony at the Hearing**

On March 26, 2008, Cochenour testified before the ALJ.  At the time of the hearing, Cochenour was 48 years old and lived alone in a house in Kahoka, Missouri.  (Tr. 25.)  He was driven to the hearing by a friend; he seldom drives.  (<u>Id.</u>)  After finishing high school, he began working for Pioneer Hi-Bred in Mount Pleasant, Iowa as a plant technician; he did not attend college or a vocational, technical, or trade school.  (<u>Id.</u>)  As a plant technician, he spent part of the year operating a semi-automatic palletizer, which he used to receive and position bags weighing between 30-70 pounds.  (Tr. 26.)  He also performed maintenance on his palletizer and other equipment.  (<u>Id.</u>)  During the remaining part of the year, he worked in maintenance. (Tr. 26-27.)  He last worked for Pioneer Hi-Bred full-time on January 24, 2005, when he left on account of injuries to his lower back and neck. (Tr. 27.)  He went to the emergency room that day for treatment.  (<u>Id.</u>)

He has received epidurals to treat the pain in his neck, but given their nature, he can only receive them so often. (Tr. 27-28.)  He takes Nabumetone and Effexor twice daily and Omeprazole once daily. (Tr. 29-30.)  Before taking these medications, he took Lyrica and Celebrex, among others. (Tr. 30.)  He currently takes Effexor for his pain and depression from not being able to work.  (<u>Id.</u>)  The Nabumetone causes him stomach problems.  (Tr. 31.)  He has not had any surgeries other

---

[7]Zocor is used along with a proper diet to help lower "bad" cholesterol and fats and raise "good" cholesterol in the blood. <u>http://www.webmd.com/drugs</u> (last visited May 5, 2011).

than the epidurals, and last did physical therapy in the summer of 2006, but it did not help his pain. (<u>Id.</u>)

On a normal day, he wakes up at 8:00 a.m., takes care of his personal needs, and walks four blocks to get his mail from the post office. (Tr. 32.) After he gets home, he reads his mail and naps. (Tr. 33.) Then he finds something to eat for dinner, watches television, and goes on a short walk until he settles down to sleep. (<u>Id.</u>) When he leaves his house, it is to go to the post office, to visit his doctors, and to get groceries from the grocery store that is connected to his lot. (<u>Id.</u>) He also walks with his son or other visitors up to town or to a farm. (Tr. 34.)

Before his injuries, he enjoyed using his truck and tractor, but sold them when he was no longer able to enjoy them. (<u>Id.</u>) He is still able to hunt deer. (<u>Id.</u>) The heaviest thing he can lift is a gallon of milk. (Tr. 35.) He can stand for about 30 minutes at a time, which does not allow him to do much other than walk to pick up his mail, which takes about 20 minutes. (<u>Id.</u>) The farthest from home he has been since his injuries is Hannibal or Burlington. (<u>Id.</u>) He has difficulty tying his shoes, putting his shoes on, washing his hair, shaving, and dressing. (Tr. 35-36.) He goes to church about once a month. (Tr. 36-37.) About once a week he volunteers at the senior center by helping prepare and serve meals. (<u>Id.</u>) He tries to mow his yard with his riding mower and push mower. (Tr. 37.) He has not had any difficulties obtaining treatment due to lack of resources. (<u>Id.</u>)

He sees his pain doctor, Dr. Rehnquist, and occasionally sees his family physician, Dr. Becker, but only when his pain is bad or to refill or change his medication. (Tr. 38.) He received long-term disability benefits from his employer. (Tr. 39.) He has a neighbor come over and do his dishes, vacuuming, sweeping, mopping, and laundry. (<u>Id.</u>) He can mow his yard for only 15 minutes at a time before having to go inside and lay down. (Tr. 39-40.) He uses his riding mower as much as he can before using his push mower for trimming because his push mower causes him pain. (Tr. 40.) He is not able to sleep a full night, as his neck and lower back pain wake him up at least 3 times during the night. (<u>Id.</u>) He lays on a vibrating pad for 30 minutes in the afternoon to

help his pain. (Tr. 40-41.) He usually falls asleep twice daily for 1-2 hours because he is tired from not sleeping the night before. (Tr. 41.) After he walks to the post office, he leans on the counter to go through his mail and then walks home. (Tr. 41-42.)

His neck and back problems also cause him severe headaches twice each week. (Tr. 42.) His headaches last all day, even though he takes aspirin. (<u>Id.</u>) His neck pain radiates down through his arms and hands, causing burning and stabbing pain, with his left side worse than the right. (Tr. 43.) He also has numbness primarily in two fingers on his left hand. (Tr. 43-44.) He is going to see a neurologist about his numbness because he was told it may be caused by a pinched nerve. (Tr. 44.) His neck hurts when he moves his head side-to-side, which makes driving difficult. (<u>Id.</u>) Although his pain and numbness are more severe on his left side, they cause him problems on his right side all the time. (Tr. 45.) His lower back pain travels down his legs to his feet, with his left side worse than his right. (Tr. 45-46.)

His depression causes him difficulty concentrating, focusing, and completing tasks. (Tr. 46-47.) He does not drive much because he cannot move around while driving. (Tr. 47.) He has been treated by Dr. Becker since he was a child. (<u>Id.</u>) He can lift less than 10 pounds frequently and 10 pounds occasionally, and if he were to lift more, he would hurt. (Tr. 47-48.) He can stand for less than 2 hours in an 8-hour workday; sit for less than 6 hours in an 8-hour workday; and is limited in his abilities to push and pull. (<u>Id.</u>) His left arm and left leg are especially weak, and he cannot squat without pain. (Tr. 48.)

He has not had an epidural in his lower back because his doctors are saving it for an emergency, such as when he is cannot walk. (Tr. 49.) He has never had injections other than steroid injections. (<u>Id.</u>) He gets his prescriptions from Walmart because they mail them to him. (Tr. 57.) He does not get sample prescriptions from his doctors. (<u>Id.</u>)

**Testimony of the Vocational Expert**

John McGowan, a vocational expert (VE), testified that Cochenour's past work was as a pallet operator, which was either medium or heavy

work, and as a maintenance mechanic, which was medium work. (Tr. 53.)

The ALJ posed hypothetical questions to the VE. In the first hypothetical, the ALJ asked the VE to assume an individual of Cochenour's age, education, and work experience, who could lift 20 pounds occasionally and 10 pounds frequently; occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; could not repetitively reach overhead; could not work in extreme cold; could not work in a full body vibration job; could not work near dangerous heights; and could not work near dangerous machinery. (Tr. 54.) The VE testified that this hypothetical individual could not perform Cochenour's past work. (Id.) However, that individual could perform light work, such as bench assembly work and working as a gate guard. (Tr. 55.)

In the second hypothetical, the ALJ reduced the exertional level to sedentary; maximum lifting capacity to 10 pounds; maximum standing and/or walking to 2 hours in an 8-hour workday; and maximum time spent sitting being 6 hours. (Id.) The VE testified that this individual could still perform light work, including working as an electronic circuit board assembler and working in a surveillance security system monitoring position. (Tr. 55-56.)

In the third hypothetical, the individual could not lift 10 pounds; could lift some amount less than 10 pounds; could stand and/or walk less than 2 hours in an 8-hour workday; could never climb, balance, kneel, crouch, or crawl; could only occasionally reach, handle, finger, and feel; and limited in abilities to push and/or pull. (Tr. 56.) The VE testified that these limitations would preclude even sedentary employment. (Tr. 56-57.)

Cochenour's attorney then asked the VE to assume a fourth hypothetical, in which the individual was required to nap or fell asleep. (Tr. 57.) The VE testified that this would also preclude all competitive employment. (Id.)

### III. DECISION OF THE ALJ

The ALJ followed the required regulatory five-step procedure in reaching a decision. At Step One, the ALJ found that Cochenour met the

insured status requirements and had not engaged in substantial gainful activity since his alleged onset date.[8]

At Step Two, the ALJ found that Cochenour suffered from severe impairments of degenerative disc disease of the cervical and lumbar spine. The ALJ found that Cochenour did not suffer from a severe mental impairment, including depression, which Cochenour raised for the first time at the hearing. (Tr. 11-12.) At Step Three, the ALJ found that Cochenour's impairments or combination of impairments did not meet or medically equal a listed impairment. (Tr. 12.)

The ALJ then found that Cochenour had the residual functional capacity to perform light work, except for lifting or carrying more than 20 pounds occasionally and 10 pounds frequently; standing or walking more than 6 hours in an 8-hour workday with normal work breaks; climbing ladders, ropes, or scaffolds; climbing ramps or stairs, stooping, crouching, kneeling, or crawling; reaching overhead; and concentrated exposure to extreme cold, vibration, or hazards. (Id.) In so finding, the ALJ afforded great weight to the opinions of Cochenour's treating physician, Dr. Johns, and little weight to the medical source statement of another treating physician, Dr. Beckert. (Tr. 14-15.)

At Steps Four and Five, the ALJ found that Cochenour was unable to return to any past relevant work, but that considering Cochenour's age, education, work experience, and RFC, he was able to perform jobs existing in significant numbers in the national economy. (Tr. 15-16.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is

---

[8]Although the ALJ listed September 1, 2005 as Cochenour's alleged disability onset date, Cochenour amended his alleged disability onset date to January 24, 2005 at the hearing. (Tr. 23.) Neither party raises this issue or argues that reversal is required on the basis of Cochenour's actual alleged disability onset date.

enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Cochenour could not perform his past work, but that he maintained the RFC to perform other work in the national economy.

## V. DISCUSSION

Cochenour argues the ALJ erred in (1) rejecting Dr. Beckert's January 12, 2008 medical source statement; (2) discounting his credibility; (3) failing to provide specific reasons for rejecting the opinions of Terri Jones and Tyler Thompson; and (4) relying on the VE's response to an improper hypothetical question. Cochenour also argues that the ALJ has a known bias against Social Security claimants.

## A. Dr. Beckert's January 12, 2008 Medical Source Statement

Cochenour argues the ALJ erred in failing to adopt Dr. Beckert's January 12, 2008 medical source statement, in which Dr. Beckert opined that Cochenour could lift and/or carry less than 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for less than 2 hours in an 8-hour workday; sit for less than 6 hours in an 8-hour workday; was limited in his ability to push and/or pull; could never climb, balance, kneel, crouch, crawl, or stoop; was limited to occasionally reaching and in his gross and fine manipulation abilities, but had no limitations regarding his skin receptors, or his ability to see, hear, or speak; and limited in his ability to withstand temperature extremes, vibrations, hazards, and fumes, but unlimited in his ability to withstand noise, dust, and humidity/wetness. (Tr. 276-79.)

The ALJ provided sufficient reasons to reject Dr. Beckert's statement. The ALJ noted that the medical source statement was "the product of a pre-printed form questionnaire" on which Dr. Beckert checked boxes indicating his findings, and offered no supporting objective medical evidence despite space provided on the form asking for such evidence. Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.") (alteration in original) (quotation omitted); Bonnell v. Astrue, 650 F. Supp. 2d 948, 959-60 (D. Neb. 2009) ("A medical source statement cannot be discounted on the basis that the 'evaluation by box category' is deficient ipso facto, but where the limitations listed on the form stand alone and were not mentioned in treatment records nor supported by any objective testing or reasoning, the statement may be entitled to little or no weight.") (internal citation omitted). Dr. Beckert's statement

was also inconsistent with Cochenour's daily activities, which include caring for his personal needs, walking four blocks each morning to and from the post office, fixing his own meals, going on walks, shopping for groceries, mowing his yard in 15-minute increments, and hunting deer. (Tr. 33-35.) See Cain v. Barnhart, 197 Fed. App'x 531, 533-34 (8th Cir. 2006) (per curiam). The ALJ also noted that Dr. Beckert's findings were based on Cochenour's subjective complaints rather than objective evidence. Wildman, 596 F.3d at 967. Thus, the ALJ did not err in rejecting Dr. Beckert's January 12, 2008 medical source statement.

## B. Cochenour's Credibility

Cochenour argues the ALJ erred when he noted that Cochenour was directed to have an MRI done on October 2, 2006, but he had not had the MRI done by the time he was next treated on May 4, 2007. The ALJ also noted that on that date, Cochenour refused anything more than a cursory physical examination, and was not willing to discuss pain management treatment. (Tr. 11.) Cochenour argues the MRI was not performed because his worker's compensation carrier had not approved it.

Although the record is unclear as to why Cochenour had not completed the MRI,[9] Dr. Rosenquist's notes state that Cochenour "[was] not willing to discuss injection procedures or other methods of treating his pain and he refuses any more than a cursory physical examination." (Tr. 286.) Therefore, the ALJ did not err in discounting Cochenour's credibility on these grounds.

Cochenour also argues the ALJ did not afford his work history sufficient weight. The ALJ recognized that Cochenour "has a good work history prior to the alleged onset date of disability," but also noted that "this alone will not support [Cochenour's] allegation of

---

[9]On August 21, 2007, Dr. Rosenquist noted: "An MRI was ordered but Mr. Cochenour did not follow up and have the exam done. He notes that his job has not approved of this MRI and that is why he has not had it done." (Tr. 289.) But, Dr. Rosenquist's May 4, 2007 notes make no mention as to why Cochenour had not had the MRI done. (Tr. 286.) Further, at the hearing, Cochenour testified that he had difficulty obtaining treatment, and that "if [he] request[ed] [anything], it's been taken care of." (Tr. 37.)

disability." (Tr. 13.) A claimant's work history is but one factor an ALJ must consider when evaluating a claimant's credibility. Given that the ALJ expressly acknowledged Cochenour's good work history, the ALJ did not err in finding that other factors undermined Cochenour's credibility. See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (ALJ recognized claimant's "good work history" but still properly discounted claimant's subjective complaints of pain).

Cochenour further argues that his daily activities do not conflict with his subjective allegations of pain. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Cochenour testified that he lives alone, cares for his own personal needs, walks four blocks each morning to and from the post office, fixes his own meals, goes on walks, shops for groceries, goes deer hunting, and mows his yard in 15-minute intervals. (Tr. 33-35.) Thus, the ALJ had a sufficient basis for discounting Cochenour's testimony. See Turner v. Astrue, No. 4:08-CV-107 CAS, 2009 WL 512785, at *12 (E.D. Mo. Feb. 27, 2009) (claimant's ability to cook, clean, occasionally mow his lawn, walk to the mailbox, take out the trash, do laundry, shop, hunt, and fish were inconsistent with this allegations of disabling pain).

Cochenour also argues that the ALJ erred by using his appearance at the hearing to discount his credibility, and that his appearance at the hearing actually supports his subjective complaints. In discrediting Cochenour's testimony, the ALJ noted that Cochenour "did not appear in any obvious credible physical or mental distress during the course of the scheduled hearing." (Tr. 14.) The ALJ was permitted to use his observations from the hearing in assessing Cochenour's credibility. "The ALJ's personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." Johnson, 240 F.3d at 1147-48. Although Cochenour testified that he was holding his left arm during the hearing because it hurt, the ALJ's findings infer that he found Cochenour's testimony incredulous. Thus, the ALJ did not err in using his observations of

Cochenour's demeanor during the hearing as a factor in assessing his credibility.

## C.   Opinions of Terri Jones and Tyler Thompson

As Cochenour's friends, Ms. Jones and Mr. Thompson gave their opinions as "other sources" under the regulations.  20 C.F.R. § 404.1513(d).  As such, the ALJ has more discretion in weighing their opinions.  Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005).

Cochenour argues that the ALJ failed to provide specific reasons for rejecting the opinions of his friends, Terri Jones and Tyler Thompson.  However, the ALJ considered these opinions and afforded them little weight, reasoning that they were given by non-medical sources, inconsistent, and unsupported by objective evidence.  (Tr. 14.)  See Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (other source opinions entitled to little weight when not supported by objective evidence and inconsistent with other evidence of record).  Further, after discounting Cochenour's testimony, the ALJ was permitted to discount the cumulative opinions of his friends.  See Black v. Apfel, 143 F.3d 383, 387 (8th Cir. 1998) ("The ALJ, having properly discredited [the claimant's] complaints of pain, was equally empowered to reject the cumulative testimony of her parents.").  Thus, the ALJ provided sufficient reasons for discounting the opinions of Ms. Jones and Mr. Thompson.

## D.   VE's Testimony

Cochenour argues that the ALJ should have relied on the VE's testimony given based on the restrictions set forth in Dr. Beckert's January 12, 2008 medical source statement.  However, because the ALJ did not err in affording the medical source statement little weight, the ALJ did not err in adopting the VE's testimony given in response to a hypothetical question that did not reflect the limitations set forth in the medical source statement.  See Reynolds v. Astrue, 390 Fed. App'x 612, 612-13 (8th Cir. 2010) (per curiam); Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

**E. ALJ Bias**

Cochenour argues that the ALJ was generally predisposed to denying his claim, even more so because he alleged suffering from disabling depression.[10]   Cochenour offers statistics indicating the ALJ's disability claim approval rate in 2006 was 36%, and that the national approval rate is 62%.  Cochenour also notes that of the 59 decisions rendered by the ALJ to claimants represented by his counsel's law firm, 23 were fully or partially favorable and 36 were unfavorable, yielding a 61% denial rate.  Cochenour also further notes that 30 of the 36 denials involved claims of disabling mental impairments.

A Social Security disability claimant has the right to a full and fair hearing before an impartial ALJ.  Valenti v. Comm'r of Soc. Sec., 373 Fed. App'x 255, 258 (3d Cir. 2010).  "There is a presumption of honesty and integrity in those serving as adjudicators."  Partee v. Astrue, No. 09-3570, --- F.3d ----, 2011 WL 1485489, at *4 (8th Cir. Apr. 20, 2011) (quotation omitted).  This presumption can be rebutted by a showing of a "conflict of interest or some other specific reason for disqualification."  Valentine v. Comm'r of Soc. Sec., 574 F.3d 685, 690 (8th Cir. 2009); Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001).  The claimant bears the burden of showing that the ALJ's behavior, in the context of the whole case, "was so extreme as to display [a] clear inability to render a fair judgment."  Rollins, 261 F.3d at 858.

The statistics offered by Cochenour are insufficient, standing alone, to support a finding of bias.  See Aquon v. Astrue, No. 2:09 CV 61 DDN, 2011 WL 839568, at *23-24 (E.D. Mo. Mar. 7, 2011); Perkins v. Astrue, 2:09 CV 38 AGF, 2010 WL 3908598, at *15-16 (E.D. Mo. Sept. 30, 2010).  To prove an ALJ's general bias, a claimant should be able to show both direct and circumstantial evidence of bias.  Doan v. Astrue, No. 04CV2039 DMS (RBB), 2010 WL 1031591, at *14-15 (S.D. Cal. Mar. 19, 2010).  Relevant evidence considered in determining whether a bias exists includes "(1) admissions by the ALJ indicating generalized bias

_____

[10]As previously noted, Cochenour did not originally allege disability on the basis of depression, but raised this allegation during his testimony before the ALJ.

or predisposition against Social Security claimants generally or certain groups specifically; (2) testimony from attorneys regarding the ALJ's regular use of incorrect law; (3) statistical evidence showing the number of cases involving problematic credibility determinations; and (4) statistical evidence showing the number of times claimants received benefits after remand or on subsequent applications." Perkins, 2010 WL 3908598, at *15.  See also Doan, 2010 WL 1031591, at *14-15.

In this case, the ALJ provided Cochenour with a hearing that lasted 51 minutes.  (Tr. 20-59.)  None of the ALJ's comments or questions during the hearing can be seen as showing bias or disrespect, nor does the ALJ's opinion display a bias against Cochenour's claims.  In support of his argument, Cochenour relies on statistics regarding the ALJ's favorable-to-unfavorable decision rates, but has not provided sufficient context to evaluate the statistics in a meaningful way.  Such additional information would include "how many of the ALJ's decisions have been reversed and/or remanded by the Appeals Council or a court, or how many times claimants have subsequently received benefits." Perkins, 2010 WL 3908598, at *16.  As it stands, the evidence offered by Cochenour is insufficient to establish that the ALJ showed a particular bias against him in this case. See Smith v. Astrue, Civil Action No. H-07-2229, 2008 WL 4200694, at *5 (W.D. Tex. Sept. 9, 2009) ("[D]istrict courts are in no position to judge what threshold percentage of 'favorable' decisions is necessary to acquit an ALJ of suspicion of intolerable bias against Social Security claimants.").

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on August 3, 2011.